Orzell **BILLINGSLEY**, Sr., C. Herbert Oliver, J. S. Phifer and Abraham Woods, Jr., Appellants,

v.

George W. **CLAYTON** et al., Appellees.

No. 22304.

United States Court of Appeals
Fifth Circuit.

April 5, 1966.

Orzell Billingsley, Jr., Peter A. Hall, J. Mason Davis, Oscar W. Adams, Birmingham, Ala., Charles Morgan, Jr., Atlanta, Ga., Jack Greenberg, Norman Amaker, Melvin L. Wulf, New York City, for appellant.

Richmond M. Flowers, Atty. Gen., Leslie Hall, Asst. Atty. Gen., Montgomery, Ala., Burgin Hawkins, Birmingham, Ala., Earl C. Morgan, Circuit Sol., 10th Judicial Circuit of Alabama, Birmingham, Ala., for appellees.

John Doar, Asst. Atty. Gen., David L. Norman, Charles R. Nesson, Attys., Dept. of Justice, Washington, D. C., amici curiæ.

Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL, THORNBERRY and COLEMAN, Circuit Judges.

GEWIN, Circuit Judge:

This is a jury exclusion case, but not one of the usual type. Most of the cases dealing with the subject arise from a conviction in a serious criminal case in which it is claimed that the constitutional rights of a Negro defendant have been infringed because Negroes were systematically excluded from jury service. This is a civil proceeding.

The Negro plaintiffs (appellants) brought this class action against the three members and the cerk of the Jefferson County, Alabama Jury Board (appellees), claiming systematic exclusion of qualified Negroes from the jury rolls of Jefferson County.[1] A preliminary injunction was sought but was denied after a hearing in the United States District Court for the Northern District of Alabama, such denial being without prejudice to the right to relief on final hearing. A further hearing was held, additional findings of fact and conclusions of law were entered, and relief was denied. The trial court found the existence of a disparity between the proportion of Negroes actually serving as jurors and the proportion of Negro Residents in the County, but concluded there was insufficient evidence to support a finding of improper conduct or constitutional wrongdoing on the part of appellees.

 This is one of several cases relating to the problem of discriminatory exclusion from juries recently heard by this Court en banc. Various fact situations were presented, and both *State* and *Federal* cases were involved. This case deals with a state jury selection system. Several Attorneys General of the interested states filed briefs, and the United States filed briefs in each case' as amicus curiae by invitation of the Court.[2]

Before outlining the facts which were presented at the trial, it is appropriate to discuss some of the legal principles and guidelines which have been developed by the numerous cases dealing with the subject, insofar as the same relate to the issues presented by this appeal.

 A just and fair trial by an unbiased, unprejudiced and impartial tribunal is one of the great American constitutional principles. There can be no "due process" or "equal protection" unless that principle remains inviolate. Brown v. State of New Jersey, 175 U.S. 172, 175, 20 S.Ct. 77, 44 L.Ed. 119; Hayes v. State of Missouri, 120 U.S. 68, 71, 7 S.Ct. 350, 30 L.Ed. 578; Northern Pacific R. R. Co. v. Herbert, 116 U.S. 642, 646, 6 S.Ct. 590, 29 L.Ed. 755. There is no expressed constitutional provision as to the classes of persons entitled to render jury service, but the law does require that qualified persons not be excluded from jury service on a class basis. Systematic and purposeful exclusion of

1. In Cassell v. State of Texas, 339 U.S. 282, 303–304, 70 S.Ct. 629, 640, 94 L.Ed. 839, Mr. Justice Jackson made the following suggestion:
 "Qualified Negroes excluded by discrimination have available * * * remedies in courts of equity. I suppose there is no doubt, and if there is this Court can dispel it, that a citizen or a class of citizens unlawfully excluded from jury service could maintain in a federal court an individual or a class action for an injunction or mandamus against the state officers responsible."

2. In the selection of state juries, compliance with both the due process and equal protection of the law provisions of the Fourteenth Amendment is required. See Fay v. People of State of New York, 332 U.S. 261, 284 n. 27, 67 S.Ct. 1613, 91 L. Ed. 2043. These two constitutional protections are substantially co-extensive as applied to juries.

qualified persons cannot be reconciled with the American concept of an impartial trial. Prejudices against certain classes tend to affect the judgment of jurors and result in a denial to members of such classes the full and complete enjoyment of constitutional guarantees. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664; Ex parte Virginia, 100 U.S. 339, 345, 25 L.Ed. 676; Fay v. People of State of New York, supra. It makes no difference whether the exclusion is the result of administrative action or legislative enactments. Both administrative and legislative exclusion are condemned. Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567. The applicable rules are aimed at eradicating bias, prejudice, unfairness and partiality.

■ The attack of the appellants in this case must be grounded upon proof that they and the class they represent have been the victims of improper discrimination and exclusion from jury service in the jury selection procedure. Fay v. People of State of New York, supra; Rawlins v. State of Georgia, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899. If their proof establishes the existence of a purposeful and substantially effective effort on the part of the appellees to deprive the appellants and members of their class of a realistic opportunity to render jury service, they are entitled to relief.[2a] Brownfield v. State of South Carolina, 189 U.S. 426, 23 S.Ct. 513, 47 L.Ed. 882; Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Bush v. Com. of Kentucky, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354; Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497; Thomas v. State of Texas, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512; Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

■ Bias and prejudice are not easily inferred and tend to be expelled by proof of fair representation of members of the complaining class or group on the juries involved. For example, see Swain v. State of Alabama, supra; Akins v. State of Texas, supra; Thomas v. State of Texas, supra. Minimal representation of the group claimed to have been excluded from a particular jury roll in comparison with their proportion of the population is a proper element of proof, but such proof standing alone does not constitute sufficient evidence of constitutional violation if it is adequately explained and is not long continued. In the instant case the appellants allege an intention to exclude, and the burden is upon them to prove such intent; if proved, they would be entitled to relief on that ground. Brown v. Allen, supra; Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; Tarrance v. State of Florida, supra; Fay v. People of State of New York, supra.

■ Notwithstanding the foregoing rules, the burden of proof is not insurmountable, though sometimes difficult. The difficulty arises out of the effort to prove sufficient facts to entitle the com-

---

2a. In Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184 (1947) the proof was held to be sufficient:

"We hold that the State wholly failed to meet the very strong evidence of purposeful racial discrimination made out by the petitioner upon the uncontradicted showing that for thirty years or more no Negro had served as a juror in the criminal courts of Lauderdale County. When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-contin-

ued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand."

In Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1965), the proof was deemed insufficient:

"But an imperfect system is not equivalent to purposeful discrimination based on race. We do not think that the burden of proof was carried by petitioner in this case."

plaining parties to relief.[2b] For this reason, litigants are permitted to establish a prima facie case by proof of the objective results of the jury selection procedure. Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Smith v. State of Texas, supra; Patton v. State of Mississippi, supra; Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77; Arnold v. State of North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77. As aptly stated by the Supreme Court in Akins v. Texas, supra, 325 U.S. at 403, 65 S.Ct. at 1279:

"[o]ur directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion indicated discrimination and not on the theory that racial groups must be recognized."

 Token systematic inclusion of Negroes is only a facet of the overall problem of systematic exclusion; both are condemned by Federal and State cases.[3] As stated in Brown v. Allen, 344

---

[2b] The rule as to the burden of proof is set out in Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1965); and Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613 (1947) in the following language:

"Further, '[j]urymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race.' Cassell v. State of Texas, 339 U.S. 282, 286, 70 S.Ct. 629, 631, 94 L.Ed. 839 [847] (opinion of Mr. Justice Reed, announcing judgment). Nor is the constitutional command forbidding intentional exclusion limited to Negroes. It apples to any identifiable group in the community which may be the subject of prejudice. Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866.

"But purposeful discrimination may not be assumed or merely asserted. Brownfield v. State of South Carolina, 189 U.S. 426, 23 S.Ct. 513, 47 L.Ed. 882; Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Smith v. State of Mississippi, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082; Bush v. Com. of Kentucky. 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354. It must be proven, Tarrance v. State of Florida, supra; Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497, the quantum of proof necessary being a matter of federal law." (Swain, 380 U.S. at pp. 204–205, 85 S.Ct. at p. 827).

\* \* \* \* \* \*

"It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a particular jury is not enough; there must be a clear showing that its absence was caused by discrimination, and in nearly all cases it has been shown to have persisted over many years. State of Virginia v. Rives, 100 U.S. 313, 322, 323, 25 L.Ed. 667 [670, 671]; Martin v. State of Texas, 200 U.S. 316, 320, 321, 26 S.Ct. 338, 50 L.Ed. 497, 498, 499; Thomas v. State of Texas, 212 U.S. 278, 282, 29 S.Ct. 393, 53 L.Ed. 512, 513; Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692, supra. Also, when discrimination of an unconstitutional kind is alleged, the burden of proving it purposeful and intentional is on the defendant. Tarrance v. State of Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; Martin v. State of Texas, 200 U.S. 316, 23 S.Ct. 338, 50 L.Ed. 497; Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Snowden v. Hughes, 321 U.S. 1, 8, 9, 64 S.Ct. 397, 88 L.Ed. 497, 502, 503; Akins v. State of Texas, 325 U.S. 398, 400, 65 S.Ct. 1276, 89 L.Ed. 1692, 1694." (Fay, 332 U.S. at pp. 284–285, 67 S.Ct. at p. 1626).

[3] We quote from the appellants' brief a collection of citations dealing with total exclusion and token inclusion of Negroes on juries:

"See Strauder v. [State of] West Virginia, 100 U.S. 303 [25 L.Ed. 664] (1880) (Negroes prohibited by statute); Neal v. [State of] Delaware, 103 U.S. 370 [26 L.Ed. 567] (1881) (No Negroes for jury service); Bush v. [Com. of] Kentucky, 107 U.S. 110 [1 S.Ct. 625, 27 L.Ed. 354] (1883) (Negroes prohibited by statute); Norris v. [State of] Alabama, 294 U.S. 587 [55 S.Ct. 579, 79 L.Ed. 1074] (1935) (No Negroes called

U.S. 443, 73 S.Ct. 397: "Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84." See also Scott v. Walker (5 Cir. 1966) 358 F.2d 561; Whitus v. Balkcom, (5 Cir.) 333 F.2d 496, cert. den. 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); Allen v. State, 110 Ga.App. 56, 137 S.E.2d 711 (1964); Harper v. Mississippi, 251 Miss. 699, 171 So.2d 129 (1965).

■ The aim and purpose of the law is to obtain juries which truly represent a cross-section of the community, but there is no constitutional requirement that such juries represent the proportional strength or exact percentage of the various components of the population. Swain v. State of Alabama, supra; Fay v. People of State of New York, supra; Cassell v. State of Texas, supra; Brown v. Allen, supra; Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118; Scott v. Walker, supra. As stated in the Swain case, "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."

The appellants charge in their complaint that Negro citizens possessing all the requisite qualifications of jurors and none of the disqualifications have been and are now being arbitrarily, intentionally and systematically excluded from jury service in Jefferson County, Alabama. In addition, the complaint charges

that the Negro appellants and all others similarly situated have been and are now being discriminated against in the organization of juries in Jefferson County solely on account of their race or color, and that the methods utilized in the selection of names of Negroes to be placed on the jury rolls and in the jury boxes by the appellee Board members is highly irregular, arbitrary and contrary to the Constitution and the laws of the State of Alabama and of the United States.

The prayer for relief seeks an injunction against appellees restraining them from failing or refusing to place the names of all qualified persons on the jury rolls and in the jury boxes in Jefferson County solely on account of their race or color, and from utilizing any names presently contained in the jury boxes or on the jury rolls for jury duty until such time as the names of all Negroes qualified for jury duty shall have been placed in the boxes and on the rolls.

The facts are somewhat complex and involve the Birmingham Division and the Bessemer Cut-Off Division (Bessemer Division) of the Circuit Court, which is the state trial court of record. Before discussing the facts in detail, it is appropriate to comment on the composition and actions of the Jury Board.

I

The Jury Board and Its Selection Techniques:

The general provisions with respect to juries and the jury commissions of the

within memory); Hollins v. [State of] Oklahoma, 295 U.S. 394 [55 S.Ct. 784, 79 L.Ed. 1500] (1935) (No Negroes called for jury service); Hale v. [Com. of] Kentucky, 303 U.S. 613 [58 S.Ct. 753, 82 L.Ed. 1050] (1938) (No Negroes called for 30 years); Pierre v. [State of] Louisiana, 306 U.S. 354 [59 S.Ct. 536, 83 L.Ed. 757] (1939) (One Negro called within memory); Smith v. [State of] Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84] (1940) (Eighteen Negroes called in 7 years); Hill v. [State of] Texas, 316 U.S. 400 [62 S.Ct. 1159, 86 L.Ed. 1559] (1942) (No Negroes called for 16 years); Patton v. [State of] Mississippi, 332 U.S. 463 [68 S.Ct. 184,

92 L.Ed. 76] (1947) (Three Negroes called in 30 years); Cassell v. [State of] Texas, 339 U.S. 282 [70 S.Ct. 629, 94 L.Ed. 839] (1950) (Twenty-one Negroes served in 6 years); Hernandez v. [State of] Texas, 347 U.S. 475 [74 S.Ct. 667, 98 L.Ed. 866] (1954) (No Mexicans served for 25 years); Reece v. [State of] Georgia, 350 U.S. 85 [76 S.Ct. 167, 100 L.Ed. 77] (1955) (Six Negroes called in 18 years); Eubanks v. [State of] Louisiana, 356 U.S. 584 [78 S.Ct. 970, 2 L.Ed.2d 991] (1958) (One Negro served in 18 years); Arnold v. [State of North Carolina, 376 U.S. 773 [84 S.Ct. 1032, 12 L.Ed.2d 77] (1964) (One Negro served in 24 years)."

several counties of the State of Alabama are found in Title 30, Sections 1–100, Code of Alabama, 1940 (Recomp.1958). Except for certain general provisions, the matter is largely regulated in Jefferson County by Title 62, Sections 196–228, Code of Alabama, 1940 (Recomp.1958). In Jefferson County, the body charged with the selection of jurors is called a "Jury Board" whereas, in other counties it is termed a "Jury Commission." With some exceptions which are not important to our consideration, the functions of these agencies are essentially the same, the difference being in name only. In Jefferson County state law requires the Board to obtain the names of male citizens between the ages of 21 and 65 years, Title 62, Section 199, Code of Alabama, 1940 (Recomp.1958). Under Title 62, Section 200 of the Code, the Jury Board is deemed to have performed the duties required of it by law when it has prepared a jury roll otherwise in compliance with law, consisting of at least six percent of the population of the county in accordance with the last Federal Census. According to the 1960 Federal Census figures, there were 106,409 white males (71%) and 44,864 non-white males (29%) between the ages of 21 and 65 in Jefferson County. The county lies within the 10th Judicial Circuit of Alabama and for purposes of judicial administration, is divided into the Birmingham Division and the Bessemer Division. Separate jury rolls are maintained in each division, although both are compiled by the appellee Board.

In the year 1962, 43,837 names were listed on the jury roll for the Birmingham Division, and 8,892 on the jury roll for the Bessemer Division, making a total figure for the county of 52,729. Six percent of the total population of Jefferson County is 33,092. Thus, the jury rolls contain several thousand names in excess of the six percent required by state law.

In compiling the jury rolls for both divisions, the Jury Board relies primarily on a house-to-house survey but sometimes employs the telephone directory, city directory and tax records. Voter registration lists are rarely if ever utilized by the Board because of the paucity of essential information contained on such lists, and because qualifications to vote and qualifications to serve on the jury are different. In the rural areas of the county, local storeowners, postmasters and other persons in or near the specific area under survey are consulte. The personal canvass of predominantly urban neighborhoods is conducted by the Clerk of the Jury Board, his deputy, and two to five white female assistants. The female assistants cover the white neighborhoods while the Jury Board Clerk and his male deputy make a house-to-house survey in the Negro neighborhoods. The canvassers attempt to determine the names, addresses, occupations and dates of birth of male citizens between the ages of 21 and 65. If no one is at home when a canvasser appears, a stamped, self-addressed postcard is left at the house to be completed with pertinent information and mailed back to the Jury Board.[4]

The Jury Board Clerk testified that many Negroes in the low-income areas of the county were uncooperative and evasive when interviewed, thus making information difficult to obtain. Sometimes it was necessary to canvass five or six blocks to obtain two or three names. He estimated that less than five percent

---

4. The face of the postcard contains the following information: 1. Full Name, 2. Residence Address, 3. Business Address, 4. Occupation, 5. Date of Birth, 6. Place of Birth, 7. Remarks. At the bottom of the postcard is the following statement:
 "Dear Sir: Will you be kind enough to fill out the answers to above questions, and mail this stamped card at once. This information will be of great value in our filling the jury box. If you know of any reason why you are not eligible to serve on the jury will you note it under 'Remarks.'"
 /s/ James F. Cheatwood
 Clerk, Jury Board
 The card is addressed to:
 "Jefferson County Jury Board
 311 Court House
 Birmingham 3, Alabama"

of the postcards left in such areas were returned to the Jury Board, while up to fifty percent were returned from white and "well-to-do" Negro areas. The house-to-house survey is made every two years, usually beginning in May. Thirteen to fourteen months are necessary to complete the survey. Although no particular canvassing pattern or technique is followed, the Clerk testified that he tried to obtain a fair representation of each section of the county. He was not sure that every district of each precinct was surveyed, nor could he state what percentage of homes were visited within a precinct.

As the names are collected, they are recorded on worksheets and thereafter are checked for disqualifying factors. The names of those found eligible are then placed on the jury roll of each division. A card to be used in placing a name in the jury box is then prepared and filed until such time as the filling of the box takes place. Neither the worksheets, the jury rolls, nor the jury cards designate race, and no racial count is kept of the names to be placed in the jury box. Names contained on past jury rolls are brought forward and used in succeeding rolls. When a person has actually served on a jury, his name is removed for a two-year period.

In addition to the above procedure, the Jury Board Clerk, in order to obtain a wider and more representative cross-section of names, sends letters to prominent Negro citizens in the community prior to each filling of the jury box. These letters request the names, addresses, occupations and dates of birth of qualified persons.[5] Attached to the letters is an information blank designated "Jefferson County Jury Board Information List." The "Information List" has vertical columns which designate "Full Name," "Residence Address," "Business Address," "Occupation," "Date of Birth," and "Place" of birth. Nineteen lines are contained on each information list for the names of prospective jurors. The Clerk testified that these letters and information blanks were sent only to Negroes because of the continued difficulty in otherwise obtaining qualified Negro names for the jury roll. Few replies were received from the Negro addresses. Of the 88 letters mailed in 1962, for instance, there were only 9 responses. The mailing of these letters has been a consistent practice.

The Record indicates that a substantial number of white citizens, but very few Negroes, made inquiries to the Jury Board to determine whether they were listed on the jury rolls. If persons thus making inquiries are not so listed, they are then placed on the rolls if they meet the requisite qualifications.

II

The Role of the Jury Board
Members in Filling The Box:

The Jury Board meets on the last Tuesday in August every two years to

---

5. The following is the format of the letter sent to Negro community leaders:

"May 10, 1960

Name
Address
Dear Sir:

Will you please send us a list of the names, occupations, and addresses of the men of this County who are eligible for jury service, and whom you know will make good jurors.

Please give the matter your careful consideration and select only such men as you would want to sit on the jury which might be about to pass on a case involving *your own life, liberty or property*. We feel that your interest *in good government* and in *equal and impartial justice* will cause you to take this trouble.

We are enclosing herewith information blank to fill out. No person must be selected who is under twenty-one or over sixty-five, or who is an habitual drunkard, is unfit to discharge the duties of a juror; or cannot read or write or who has ever been convicted of any offense involving moral turpitude. When this information is completed, mail it in to this office.

Thanking you for your interest, we are
Very truly yours,
JEFFERSON COUNTY
JURY BOARD
James F. Cheatwood
Clerk." (Emphasis added.)

refill the divisional jury boxes. The obtaining of information and the selection of jurors for the rolls, however, is a continuing process, with a continuous purging of the same. More than twenty categories of individuals are exempt from jury duty, based upon the nature of the employment of the individuals involved. Title 30, section 3, Code of Alabama, 1940 (Recomp.1958). At this meeting the Jury Board members take names of jurors contained on the jury roll and place them in the jury box for the respective divisions, excepting those persons who have recently served, those over-age, and those who are otherwise disqualified. The new jury roll, therefore, does not conform to the next preceding roll because of this continuous purging process. Jury rolls prior to 1953 have been burned. Once the jury box has been refilled for the respective divisions, it is then delivered into the custody and care of the presiding judge of the Birmingham and Bessemer courts. Thereafter, the Board members and the Jury Board Clerk have no further responsibility in the jury selection process.

### III

### Selection Process of Grand and Petit Juries:

(A) *The Birmingham Division:*

Some three to four weeks before the jury docket is set for call, the presiding judge draws as many names from the Birmingham Division jury box as he deems necessary to provide sufficient jurors, both grand and petit. These names are drawn at random from a large box after the cards containing the names have been thoroughly mixed. The presiding judge testified that there is no racial segregation of the cards in the box to the best of his knowledge and none is evident. At the drawing, the judge has in his presence his clerk and an assistant. As the cards are drawn they are placed on a table and stacked in groups of ten each. Once the cards are properly stacked, they are turned over to the Clerk who prepares a venire list and gives it to the

county sheriff for service of subpoenas upon the designated individuals. The jurors subpoenaed then report to the jury assembly room on the fifth floor of the courthouse at the appointed hour and date to await their call in respective cases. Shortly after the jurors arrive in the jury assembly room, they are organized and sworn in by the presiding judge or another judge of the circuit court. The cards containing the names of the jurors are then placed in another small box and a mimeographed list of these names is compiled.

When a jury is needed for trial, the trial judge sends for the small box containing the cards of the present venire and draws at random the names of 24 to 28 persons from it in the presence of the lawyers in the case. There is only one box of this type for the Birmingham Division, but each circuit judge in the division has a key to it. There are several trial judges in the Birmingham Division and each judge uses the last mentioned box as and when cases arise necessitating a jury. The names of the persons so drawn are given to the jury room bailiff who, in turn, takes the cards back to the jury assembly room and instructs the 24 to 28 jurors, as the case may be, to proceed to a designated courtroom. The lawyers in the case then proceed to interrogate the venire and exercise appropriate strikes. As many as six Negroes have appeared on the panels of twenty-four summoned from the jury assembly room in the Birmingham Division. The highest estimate of Negroes present in the jury assembly room itself has been placed at 18 to 20 persons.

When a grand jury is needed in the Birmingham Division, the presiding judge draws 18 names from the same jury box from which the petit jurors are drawn. These names, likewise, are drawn at random. The largest number of Negroes to serve on a Birmingham Division grand jury has been three according to the Circuit Solicitor. Almost all Birmingham Division grand juries include some Negroes.

**(B)** *The Bessemer Division:*

Approximately 30 days before the call of the jury docket, the presiding judge of the Bessemer Division draws eighty names (in certain types of cases a larger number may be drawn) from that Division jury box, in the presence of the court clerk, for petit jury service. The clerk then prepares a venire list which he delivers to the sheriff. The sheriff then serves subpoenas on the named individuals and at the appointed hour and date they report to the Bessemer courthouse for jury duty. One of the circuit judges or the presiding judge then organizes them, swears them in and they then await a call.

Judge Ball testified that the largest number of Negroes he had seen on any venire in the Bessemer Division was 7 or 8. When asked whether any racial segregation is practiced in the Bessemer court, the judge replied: "Well, yes. We put them on, if it comes out that way, on jury number four." It appears that the total Bessemer Division venire is divided into separately numbered petit jury panels of 12 persons each, and Negroes called for jury duty are generally placed on Petit Jury Number 4, although the record is silent as to exactly how such a racial determination is made.

Few Negroes appear to have been called for jury duty in the Bessemer Division. The evidence reveals that exactly the same standards were applied by the Jury Board in the selection of prospective jurors in the Bessemer Division as were applied in the Birmingham Division, although in his final order, the District Judge found that "Negroes seldom sit on the trial of cases * * * in the Bessemer Cut-Off." The Record as a whole amply supports the inference that few Negroes if any have actually served on petit juries, although Negroes have comprised as much as ten percent of those on the panels from which the petit juries have been selected.

When a grand jury is needed in Bessemer, the clerk takes the Bessemer Division jury box to the courtroom. There the judge unlocks the box and draws therefrom at random 35 to 40 names. The clerk then arranges the cards so drawn in alphabetical order and prepares a typed venire list, which he delivers to the sheriff. When court convenes, the names of the jurors who appear are placed in a hat, shuffled, and 18 names are drawn for grand jury duty. The remainder of the veniremen are excused. The District Judge also found that "Negroes seldom * * * serve on grand juries in the Bessemer Cut-Off." Testimony indicated that one Negro sat on a Bessemer grand jury in 1957, but that none has served since that date.

## IV

This appeal raises the question whether the Jury Board of Jefferson County, Alabama, as a Board and its duly constituted members, individually, are enforcing and maintaining a policy, custom or usage which militates against fair jury selection procedures as protected by the United States Constitution and related statutes, and the Constitution and statutes of Alabama.

After a careful and cautious examination of the entire record, the briefs, and the contentions of the parties made on oral argument, we reach the firm conclusion that the findings of the trial court are amply supported by substantial evidence, and that the court applied the correct legal standards to the facts found. The court was amply justified in concluding that the plaintiffs failed in their proof.[6]

6. Although the Government in its brief as amicus curiae suggests that the case be remanded for further hearing, the brief forthrightly admits that there was an insufficiency of the evidence. We quote from the brief:

"The difficult problem in this case is that a critical link in the evidence—the racial composition of the jury boxes— is missing. If for example the plaintiff could have proved that the jury boxes contain extremely low percentages of names of Negroes, or that some precincts heavily populated with Negroes are grossly underrepresented, these facts would cast considerable doubt upon the credibility of the testimony of members of the Jury Board explaining

Appellants attempted to show by various witnesses that a plan, scheme, or design was being employed by the appellee Board in an effort to discriminate against the Negro population of Jefferson County in regard to jury selection. They concede, however, that the Jury Board employs the proper technique in selecting jurors. In their brief appellants state:

"A Survey or canvass or sample system of juror name selection is not only a proper but is also a preferred technique which should end the systematic exclusion of racial or other groups from jury rolls."

\* \* \* \* \* \*

"The Jury Board of Jefferson County, Alabama, employs the proper technique of juror selection; the fact that it did not correctly use it should not detract from the basic soundness of the method itself, one that can and should be used in state and federal courts across the land."

Rather than systematic exclusion (which also embraces token systematic inclusion) of Negroes from the jury rolls of Jefferson County, we are convinced that the record fails to show a lack of of good faith on the part of jury officials to obtain qualified Negroes for jury service. The system used has not worked perfectly [7] in every instance, but the Jury Board has not allowed racial considerations to poison their jury selection process according to the record before us. The record reflects a good faith, bona fide effort on the part of the Board to give the Negro citizens of Jefferson County at least an equal, if not a privileged opportunity, to be called for jury service.[8]

It may be that Negro canvassers should be employed to assist in canvassing the Negro community. Counsel for appellees was interrogated on oral argument with respect to this very question. He replied that canvassers were obtained through the civil service system applicable in Jefferson County; and that there were no Negro applicants for such position. There was some indication by counsel that it might be possible to arrange for the employment of Negro canvassers through some temporary arrangement until qualified Negroes apply and are certified for employment through the civil service system. Such a procedure could possibly result in obtaining better cooperation from qualified Negroes. For reasons not apparent from the record, it is evident that a large proportion of the Negro community is either uninterested in jury service, or being interested, does not avail itself fully of the opportunity to render jury service. The techniques used by the Jury Board have made the opportunity available.

The record does disclose that Negroes seldom sit on petit or grand juries in the Bessemer Division. We do not approve the situation which the record shows to exist in the Bessemer Division. However, the record fails to show any connection whatever between this fact and the performance of their duties by the members of the Jury Board and its Clerk. As the trial court pointed out, the appellees have nothing to do with the selection of jurors to serve on petit and grand juries after their names are placed on the jury rolls. The trial court observed

---

their system for selection. If on the other hand the proof showed that there was a substantial or reasonable proportion of names of Negroes in the jury boxes the plaintiff would lose his case as to these defendants.
"As the record stands, this Court could conclude that the plaintiff had failed in his proof, since the racial composition of the jury boxes was not proved."

7. The opinion in *Swain* states: "But an imperfect system is not equivalent to purposeful discrimination based on race."

8. In Thomas v. State of Texas, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512, 1909, the Court concluded:
"If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated."

that it could not grant relief against parties not before it, or grant relief in areas over which the appellees had no jurisdiction or right to intervene. Accordingly, the trial court concluded that the action of the Jury Board should not be controlled by injunction when the right to redress appeared to be elsewhere. We quote from the findings and conclusions of the trial court relating to the Bessemer Division:

"(5) Negroes seldom sit on the trial of cases or serve on grand juries in the Bessemer Cut-Off.

(6) In the organization of the jury week-by-week Negro jurors are assigned to Jury 4.

Once the jury box has been filled possession is surrendered to the presiding judge of the court. These defendants have nothing whatever to do with the summoning of jurors for duty, drawing their names from the box, excusing them from service after they have been summoned, assigning them to numbered juries, or selecting those who shall serve on the grand jury or on the trial juries. The number of peremptory challenges in both civil and criminal cases is fixed by statute. The exercise of such peremptory challenges rests exclusively with the parties.

Any disparity between Negro and white jurors resulting from the summoning, drawing, excusing, assigning or selecting of jurors cannot be attributed to these defendants.

The court does not find evidence even in the presence of some disparity in numbers of those actually serving which is sufficient to establish discrimination against eligible Negroes in the formulation of the jury roll and in the filling of the jury box.

It hardly need be said that the Court cannot grant relief against parties not before it or grant relief in areas over which these defendants have no jurisdiction or right to intervene, and their actions should not be controlled by injunction when the right to redress appears to lie elsewhere."

It is appropriate to state that our conclusion in this case does not preclude the granting of relief in any future proceedings in which racial discrimination of a systematic nature in the jury selection process is established by adequate proof.

The judgment is affirmed.