**Rev. J. A. SALARY, Plaintiff,**

**v.**

**John C. WILSON, Jr., et al., Defendants.**
**Civ. A. No. 66–92.**

United States District Court,
N. D. Alabama, S. D.

May 6, 1970.

Jefferson County Jury Board and the Clerk of the Jefferson County Circuit Court, Bessemer Division. The suit was filed as a class action pursuant to Rule 23(a) (3) of the Federal Rules of Civil Procedure.

The main thrust of plaintiffs' complaint is that they and other Negroes residing in the Bessemer Cut-Off area have been discriminated against by not being allowed to serve on State court juries. Plaintiffs allege the discrimination was accomplished by a method or system of deliberately selecting from the jury rolls or jury list or from the jury box only a token number of Negroes for the grand and petit jury venires or panels, or by a deliberate scheme to exclude Negroes from the grand and petit jury venires or panels or by failing to summon any Negroes or by summoning only a few for jury duty. Plaintiffs allege the purpose of the method mentioned above was to assure that no Negroes or only a limited number of Negroes served on the grand and petit jury venires or panels and also to assure that those Negroes actually seated on the venires or panels could be struck easily from any panel of jurors selected in the Bessemer Division of the Jefferson County Circuit Court.

This court, after hearing the evidence and carefully studying the entire record, found the allegations made by plaintiffs to be unsubstantiated and denied the relief requested in the complaint. Only one of the plaintiffs, the Rev. J. A. Salary, appealed. The prayer for relief included a request for preliminary and permanent injunctions enjoining defendants from using the names of all persons theretofore selected for inclusion on the jury roll, list or box as then constituted for the purpose of summoning grand or petit jurors on the jury venires and panels in the Bessemer Division and a prayer that the court enjoin defendants from failing to withdraw all summons then outstanding.

The rationale for this court's initial decision was a finding that the Jury Board defendants acted in good faith and

Demetrius C. Newton, Birmingham, Ala., Norman C. Amaker, Jack Greenberg, New York City, for plaintiff.

MacDonald Gallion, Atty. Gen., State of Alabama, Montgomery, Ala., Harry E. Pickens, Deputy Dist. Atty., Tenth Judicial Circuit, Bessemer, Ala., Maurice F. Bishop, County Atty., Birmingham, Ala., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLGOOD, District Judge.

This matter is before this court for the second time, having been remanded in part by the Fifth Circuit Court of Appeals for further proceedings in accord with the dictates set forth in Salary v. Wilson, 415 F.2d 467 (5th Cir. 1969).

Plaintiffs, all Negro citizens residing in the western area of Jefferson County, Alabama, known as the Bessemer "Cut-Off", brought this suit as a class action against the members and Clerk of the

made extraordinary efforts to conscientiously and sincerely adopt and follow a system of obtaining the names of qualified citizens for jury service in a manner to insure representation of a cross section of the community and which clearly was not discriminatory in theory or method. In addition, this court found the method used by the Jury Board to select petit and grand juries in the Bessemer Division in no way discriminatory against Negro citizens on racial grounds.

The court found the procedure used by the Jury Board defendants to obtain the names of qualified citizens for jury service to be simple and effective. Hired canvassers, instructed to get as many names as possible without regard to race, made a house-to-house survey. If the canvasser was unsuccessful in rousing the occupants of a house, a card was left asking the occupant to give certain relevant information and mail back to the Jury Board. Information also was sought from neighbors.

Names of qualified jurors also were solicited from Negro ministers and other Negroes who might be in position to furnish such names. This procedure was utilized after the Jury Board realized its convassers were getting less cooperation from the Negro communities than from the white.

In addition, the Jury Board often employs the telephone directory, city directory and tax records in its search for persons qualified to serve as jurors. In rural areas of the Bessemer District, information as to prospective jurors is sought from local storeowners, postmen and other persons in the specific community.

All jury boxes in Jefferson County were refilled on May 15, 1967, so that names of qualified women jurors could be added in compliance with White v. Crook, 251 F.Supp. 401 (1966). A canvas utilizing the methods described above was initiated in early July of 1966 and completed prior to May 15, 1967. Cards were typed for each name and each card was checked for any criminal offense that might disqualify the named individual. The Bessemer box was subsequently emptied and refilled in the presence of all the members of the Jury Board after which it was locked and delivered to the custody of Mr. Elmore McAdory, Clerk of the Tenth Judicial Circuit, Jefferson County, Alabama, Bessemer Division. A total of 12,050 new names was placed in the Bessemer box compared to 8,892 in 1962. One reason for the increase was the addition of women jurors for the first time.

After examining the method in which the jury box was filled, the court turned its attention to the manner in which petit and grand juries are selected in the Bessemer Division. The two judges assigned to the Bessemer Division alternate in holding civil and criminal dockets every month except July and August. The clerk of the court, Mr. McAdory, makes up the criminal docket, cuts a stencil for it and mimeographs copies for interested parties. All capital cases are set by the judge.

The docket is then shown to the judge who sets the number of jurors to be called. The jury box is then unlocked and opened by the judge and from 80 to 100 cards are drawn. The drawing is accomplished in the courtroom, in open court. Following the drawing, the box is relocked by the judge and returned to the Clerk who places it back in the safe where it is kept when not in use.

All the cards so drawn are given to the Clerk who arranges them alphabetically and makes a duplicate list. The original is sent to the sheriff who summons the jurors listed. A return is then made to the Clerk as to the ones served and the ones who were not found. The sheriff then returns the list to the Clerk who checks on his records to determine whether the names drawn from the box were served or not found. On the first day of the trial docket, the Clerk calls the roll, corrects the list of available jurors who have reported and the venire is subsequently organized into numbered juries, usually five. This is done for reasons of convenience in that both judges hold court at the same time. The or-

der of using the numbered panels is rotated so that all are used during a court term.

Both judges employ the same method in selecting petit juries. After the cards are shuffled, the judge selecting the jury will draw six cards from the top and six cards from the bottom. The twelve so selected are designated as Jury No. 1. The process is repeated until all available jurors have been assigned to a numbered jury. The judges do not see the cards. They are drawn blind and at random after being shuffled. The cards bear no identification as to race and it is impossible to determine the color or nationality of the individual whose name has been drawn by an examination of the card itself. The jury is selected from the entire venire in a capital case.

Judge Gardner F. Goodwyn, Jr., presiding judge of the Bessemer Division, testified that in selecting a grand jury he had the shuffled cards placed in a hat. The hat was then held above his head from where he picked the necessary number of cards.

█ In Salary v. Wilson, *supra*, the appellate court affirmed this court's finding that no substantial evidence was presented of any failure to comply with constitutional standards in the various procedures by which names on the jury roll are placed on cards, the jury box filled and names drawn therefrom. Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect proportionate strength of every identifiable group. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). However, the Fifth Circuit Court of Appeals found Negroes were being constitutionally excluded from the compilation of the jury box and jury roll and directed this court to require the preparation of a jury roll and box from which Negroes are not unconstitutionally excluded and to prevent further use of any jury roll and box from which Negroes are constitutionally excluded.

The court now finds that the jury box and jury roll attacked in the *Salary* case were discarded on August 26, 1969. A newly compiled jury box and jury roll were substituted on the same date. Names for the new jury box and jury roll were secured in the manner previously outlined with several significant and important changes. Of the ten canvassers used to gather names, four were Negroes. These were hired by the Jury Board in an attempt to effect better cooperation from the Negro community, which has historically been reluctant to furnish white canvassers with the necessary information. Prior to this time, all canvassers had been white. The four Negro canvassers proved successful in working the predominantly Negro neighborhoods in the Bessemer District and a significant number of qualified Negro persons were added to the jury box and jury roll. The court feels the painstaking work of the canvassers in going from doorstep to doorstep, the hiring of four Negro canvassers to assist in winning the confidence of the Negro community and thus garner more names of prospective jurors and the continued efforts of the Jury Board coupled with its continued show of good faith in compiling a jury box and jury roll in compliance with the Constitution clearly show that the Board members are fairly and adequately discharging the constitutional burden cast upon them. Billingsley v. Clayton, 359 F.2d 13 (5th Cir. 1966).

Figures submitted to the court since the jury box was refilled on August 29, 1969, show a marked increase in the number of Negroes actually on the venire and on the jury roll and jury box. Evidence shows the venire in the Bessemer Division was composed of 17 Negroes and 37 whites on October 6, 1969; 26 Negroes and 49 whites on October 25, 1969 and 23 Negroes and 47 whites on November 1, 1969.[1] This represents respective percentages of 31.5, 34.7 and 32.8. On February 9, 1970, 25.2 per cent of the 88 persons on the venire were Negroes while

---

1. See Exhibit "A" to opinion.

35 per cent of the 100-man venire on February 23, 1970, were Negro.[2] Further evidence presented to the court shows 57 persons were on a venire summoned on March 23, 1970. Fourteen of those were Negro or 24.5 per cent. From this number, six Negroes and twelve whites were chosen for grand jury duty.[3] And, finally, 25 of the 80 jurors or 31.2 per cent summoned on April 6, 1970, were Negro. A jury of five Negroes and seven whites were chosen from the April 6 venire for trial duty.[4] It is obvious to this court that the Jury Board is fairly and honestly endeavoring to discharge its duties and is not discriminating against the Negro race.[5] The figures quoted above bear out their efforts.

In Avery v. Georgia, 345 U.S. 559 at 561, 73 S.Ct. 891 at 892, 97 L.Ed. 1244 at 1247 (1953), the duty of jury board members was defined.

> "The Jury Commissioners, and the other officials responsible for the selection of the panel, were under a constitutional duty to follow a procedure —'a course of conduct'—which would not 'operate to discriminate in the selection of jurors on racial grounds.'"

These duties were broadened in Brooks v. Beto, 366 F.2d 1 at page 12 (1966) where the court said innocence and good faith in the performance of a jury board were not enough.

> "[T]o the contrary, the law—the very demands of the Constitution—so developed as to place a specific, tangible, identifiable burden on jury-choosing officials. It is not enough to choose from those they see. They must uncover the source of competent jury prospects from all significantly identifiable elements of the community."

The court suggested in Brooks, supra, at page 23, that members of a jury board or jury commission could remedy the problem of finding minority race jurors by:

> "[T]he establishment of a more or less systemized procedure for contacting responsible members or organizations within the class to obtain names or lists of names of those likely to be available and qualified."

And in Billingsley v. Clayton, supra, 359 F.2d at page 23 also, the court recommended that Negro canvassers should be employed to assist in canvassing the Negro community. It is significant to note that the Jury Board in this case stands in compliance with both the above recommendations.

While the percentage of Negroes selected for jury duty is below the percentage of Negroes actually residing in the Bessemer District,[6] it is clearly evident the Jury Board is striving in every way feasible to increase the Negro ratio in the jury box. However, the percentage factor, in light of the Jury Board's actions, is not a relevant factor. Indeed, as the Supreme Court said in Swain v. Alabama, supra, 380 U.S. at page 208, 85 S.Ct. at page 829:

> "Venires drawn from the jury box * * * unquestionably contained a smaller portion of the Negro community than of the white community. * * * Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation.'"[7]

---

2. See Exhibit "B" to opinion.
3. See Exhibit "C" to opinion.
4. See Exhibit "D" to opinion.
5. In Thomas v. State, 212 U.S. 278, 29 S.Ct. 393, 53 L.Ed. 512 (1909), the Court said:
   "If they fairly and honestly endeavored to discharge their duty, and did not in fact discriminate against the negro race in the selection of the jury lists, then the Constitution of the United States has not been violated."
6. Salary v. Wilson, 415 F.2d 467, at page 470 (5th Cir. 1969).
7. Salary v. Wilson, id. at page 470, nn. 5 & 6.

A comparison of percentage figures, however, graphically acknowledges the strides made by the Jury Board in getting Negroes in the jury box. Plaintiff introduced evidence indicating there were 20,238 Negroes and 16,158 whites in the Bessemer Division in 1967 who were above the age of twenty-one. As stated in Salary v. Wilson, *supra*, 415 F.2d at page 470:

> "[T]hus, Negroes potentially available for jury service represented approximately 55 percent of the population. The jury roll compiled in 1966–67—the latest one before us on this appeal—contained 12,050 names, of which 1,549 were Negroes. This represents 12.9 percent of the total number of names on the roll. The jury roll in use in 1966 contained 9,546 names of which 675 were Negroes, approximately seven percent." [8]

Since the jury box was refilled on August 29, 1969, this percentage has dramatically increased as shown by facts previously set forth in this opinion. The techniques now employed by the Jury Board have been responsible for the increase.[9] This court is confident that the Board will strive to continue fulfilling its constitutional obligations.

■ For the reasons stated and based on the facts recited herein, this court is of the firm opinion that the jury box in the Bessemer Division is constitutionally composed and, further, the court finds the method now employed in filling said box to be nondiscriminatory to any minority race. The court, however, is also of the opinion that jurisdiction over the matters contained herein should be retained for a period of one year and that quarterly reports be made to it by the Jury Board setting forth the racial composition of venires summoned in the Bessemer District.

Therefore, judgment and decree in accordance with this opinion will be entered.

EXHIBIT "A"

STATE OF ALABAMA ⎫
JEFFERSON COUNTY ⎬

Before me, the undersigned authority in and for said State and County, personally appeared John C. Wilson, Jr. who being by me first duly sworn, deposes and says on oath as follows:

My name is John C. Wilson, I reside at 420 South 18th Street, Bessemer, Alabama and I am President of the Jury Board of Jefferson County and I have been on said board for the past 6 years.

The present jury roll and jury box in use in the Bessemer Division of Jefferson County was filled and put in use on August 26, 1969.

To fill this partcular box several negro canvasers were used. We used in all ten canvasers to gather names for this box, five at a time. Of each group of five, 3 were white and 2 were negro.

I noticed a lot better cooperation by the negro community than we have had in the past, therefore, we were able to secure more names of qualified negro people to serve in our jury box. I personally checked the Bessemer jury of October 6, 1969. There were 54 jurymen 17 of which were negro. On October 25, 1969, there were a total of 75 jurymen, 26 of which were negro. On No-

---

8. In *Billingsley, supra,* 359 F.2d at page 18, Judge Gewin concluded that:

> "The aim and purpose of the law is to obtain juries which truly represent a cross-section of the community, but there is no constitutional requirement that such juries represent the proportional strength or exact percentage of the various components of the population."

9. This court is hard pressed to unveil any methods to entice more Negro jurors other than the ones used by the Jury Board. Perhaps, the continuing absence of any qualified Negroes is explained in Billingsley v. Clayton, *supra,* 359 F.2d at page 23 where the court said:

> "For reasons not apparent from the record, it is evident that a large proportion of the Negro community is either uninterested in jury service, or being interested, does not avail itself fully of the opportunity to render jury service. The techniques used by the Jury Board have made the opportunity available."

vember 1, 1969, of a total of 70 jurors, 23 were negro. This represents a percentage of 31.5%, 34.7%, and 32.8%.

The jury box which was the subject of the suit in which I was the Respondent, Case No. 25978, in the United States District Court is no longer in use and has been discarded.

The present box I believe contains many more names of negro people and I believe meets the requirements of the above named case.

(s) John C. Wilson Jr.

Sworn to and subscribed before me this 31st day of December, 1969.

(s) Betty R. Mize

NOTARY PUBLIC

EXHIBIT "B"

STATE OF ALABAMA ⎫
JEFFERSON COUNTY ⎬

Comes now Mary S. Bryant, who, after being duly sworn, deposes and says as follows:

My name is Mary S. Bryant, I am a Typist-Clerk in the office of the Deputy District Attorney, Harry E. Pickens, in the Bessemer Division of Jefferson County Alabama. I was directed by Mr. Pickens to count the number of jurors each week when the jury was summoned and to determine the number of white people and the number of negro people on each jury. On February 9, 1970, and on February 23, 1970, juries were summoned. These were the only juries in February.

On February 9, 1970, there were 88 jurymen on the venire, 25.2% were negro and 74.8% were white. On February 23, 1970, there were 100 jurymen on the venire, 35% were negro and 65% were white.

(s) Mary S. Bryant
Affiant

Sworn to and subscribed before me this the 3rd day of March, 1970.

(s) Louise G. Ashley
Notary Public

EXHIBIT "C"

STATE OF ALABAMA ⎫
JEFFERSON COUNTY ⎬

Comes now Rondle E. Barron, who, after being duly sworn, deposes and says as follows:

My name is Rondle E. Barron, I am an Investigator in the office of the Deputy District Attorney, Harry E. Pickens, in the Bessemer Division of Jefferson County Alabama. I was directed by the Deputy District Attorney to count the number of jurors on Monday, March 23, 1970, and determine the number of white people and the number of negro people.

I determined that there were 57 number of people on the whole venire, that there were 14 negro people and 43 white people. From this number, 18 jurymen were chosen for the Grand Jury, 6 of which were negro and 12 white.

(s) R. E. Barron
AFFIANT

Sworn to and subscribed before me this the 23rd day of March, 1970.

(s) Louise G. Ashley
NOTARY PUBLIC

EXHIBIT "D"

STATE OF ALABAMA ⎫
JEFFERSON COUNTY ⎬

Comes now Rondle E. Barron, who, after being duly sworn, deposes and says as follows:

My name is Rondle E. Barron, I am an Investigator in the office of the Deputy District Attorney, Harry E. Pickens, in the Bessemer Division of Jefferson County, Alabama. I was directed by the Deputy District Attorney to count the number of jurors on Monday, April 6, 1970, and determine the number of white and the number of negro jurors.

There were 80 jurors present in Court prior to the time that any jurors were excused; 55 of that number were white and 25 were negro. Shortly after this determination was made a jury of 14 jurymen was selected to sit on the case of the State of Alabama vs. Caliph Washington. Enclosed and attached hereto

and made a part of this affidavit is a photograph of the final jury in the Criminal Court of Jefferson County, Alabama, Bessemer Division, which consists of 7 white people and 5 negro people.

BIRMINGHAM POST-HERALD – April 10, 1970

The 12 jurors sit in the jury box at the Caliph Washington murder trial before entering deliberation Thursday afternoon. (Photo by Bill Ingram).

**Jurors**

LA19171

(s) R. E. Barron
Affiant

Sworn to and subscribed before me this the 14th day of April, 1970.

(s) Louise G. Ashley
Notary Public