UNITED STATES ex rel.
Clarence WILSON

v.

Honorable Victor G. WALKER, Warden,
Louisiana State Penitentiary,
Angola, Louisiana.

Misc. No. 726.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Jan. 24, 1967.

G. Wray Gill, Sr., George Leppert, New Orleans, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., Teddy W. Airhart, Jr., Asst. Atty. Gen., Baton Rouge, La., Leonard E. Yokum, Asst. Dist. Atty., Parish of Tangipahoa, Hammond, La., for respondent.

WEST, District Judge:

Petitioner, Clarence Wilson, is presently incarcerated in Louisiana State Penitentiary at Angola, Louisiana, awaiting the execution of a death sentence imposed by the Twenty-First Judicial District Court for the Parish of Tangipahoa, Louisiana, following his trial and conviction by a jury of the crime of aggravated rape. He now petitions this Court for the issuance of a writ of habeas corpus, and as grounds therefor, alleges: (1) that he was illegally arrested; (2) that certain inculpatory statements, both written and oral, made by him, were involuntarily made and that thus their use against him during his trial was a violation of his constitutional rights; (3) that he was represented by incompetent counsel during his trial; (4) that local prejudice against him was high at the time of his trial, and that the refusal of the trial court to grant him a change of venue violated his constitutional rights; (5) that the trial court erred in refusing to excuse, for cause, certain jurors who, on their voir dire, evidenced prejudices toward him; and (6) that there was a systematic exclusion, or a systematic inclusion of a token number of Negroes on the grand and petit juries that indicted and convicted him.

Petitioner was represented by his retained counsel at the evidentiary hearing held before this Court, and following the hearing, the Court was furnished with a transcript of the State Court proceedings had against petitioner. Each party to this litigation has furnished extensive briefs, and now, after a thorough review of the State Court proceedings, the evidence adduced, and the briefs of counsel, it is the opinion of this Court that petitioner has failed to prove by anything like a preponderance of the evidence that his constitutional rights have in any way been violated in connection with his arrest, trial, conviction, and incarceration growing out of the crime of aggravated rape with which he was charged and for which he was convicted.

On September 30, 1959, a housewife in Tangipahoa Parish, Louisiana was raped. From the description of the attacker given by the victim, petitioner, Clarence Wilson, was suspected of having committed the crime, and a manhunt ensued in the community where the crime had occurred. The citizenry was alerted to the fact that the crime had been committed and that the victim was at large, and consequently, private citizens, as well as law enforcement officers, were searching for the suspect. Two days later, on October 2, 1959, one Charles Giannobile, a private citizen, saw petitioner crossing a field, whereupon he arrested him, held him at gunpoint, and sent a call for the police. Between the time he spotted the petitioner, and the time the police arrived, a crowd estimated at up to 200 people had gathered, but no one attempted to harm petitioner while he was held awaiting the arrival of the police. There was evidence that some comments were made indicating that some of the spectators felt that the arresting citizen should have killed the suspect rather than have arrested him, but no attempt at violence was indicated at any time. After the police arrived he was taken into their custody and, while in the police car on the way to the police station, he made certain oral inculpatory statements, and then, within thirty minutes after arriving at the police station, he signed a written confession, in which the facts and circumstances of the crime coincided precisely with the report made by the victim. Thereafter petitioner was tried before a jury, found guilty, and sentenced to be electrocuted in accordance with Louisiana law.

██ Several of the contentions now made by petitioner need no discussion as it is patent upon the face of the record that they have no merit. First of all, his contention that he was illegally arrested and that he was not represented by competent counsel need not be considered by this Court because these contentions have never been presented to a State Court, either by way of appeal or by way of habeas corpus proceedings, and thus petitioner has failed to exhaust his available State Court remedies. Thus, this Court at the present time has no jurisdiction insofar as these two contentions are concerned.

██ Petitioner claims that his confessions were involuntarily given. There is simply no evidence whatsoever in this record to substantiate such a claim. The fact that he was convicted long before *Escobedo v. State of Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), was decided requires the holding now that the requirements of that case are not available to this petitioner. *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is simply nothing in this record that would indicate that any of petitioner's constitutional rights, as they existed at that time, were in any way violated in connection with the obtaining of his confessions. Petitioner's counsel moved the trial court for a change of venue based upon a contention that local prejudice was so high in the community that it would be impossible for him to obtain a fair trial. This motion was heard in detail by the trial court, at which time substantial evidence was taken, and a review of this evidence leads to the inevitable conclusion that the State trial court was eminently correct in denying the change of venue. There was absolutely no indication that, at the time of his trial, there was any undue preju-

dice in the community against this petitioner. As a matter of fact, all of the evidence indicated that the matter had died down to the point where there was a minimum of interest evidenced in the case at the time it came on for trial. While upon their voir dire, some prospective jurors evidenced a prejudice against the defendant, nevertheless, whenever such prejudice was evidenced, the juror was excused by the Court for cause. A review of this record does not indicate to this Court that the prejudice shown was any greater than it would be in any case, in any community, where a person was being tried for the crime of rape. This same conclusion pertains to petitioner's contention that the Court failed to excuse certain jurors for cause when prejudice against the defendant was indicated. A review of the record leaves no doubt in this Court's mind that the trial judge carefully and conscientiously excused every juror where there was any question as to his ability to serve as an impartial juror. This contention was reviewed in detail by the Supreme Court of Louisiana, State of Louisiana v. Wilson, 240 La. 1087, 127 So.2d 158 (1961), and now after a careful, independent review by this Court, it is my opinion that the conclusions drawn by the Justices of the Supreme Court of the State of Louisiana were eminently correct. Thus, the Court finds no merit to this contention.

The last ground now relied upon by petitioner for the issuance of a writ of habeas corpus is that there was a systematic exclusion of Negroes or a systematic inclusion of a token number of Negroes on the grand and petit jury lists in Tangipahoa Parish at the time of his trial. It is the opinion of this Court that petitioner has failed to prove, by a preponderance of the evidence, that there is merit to that contention.

While the law pertaining to jury selection is, at least in the Fifth Circuit, in an unhappy state of flux as is evidenced by the recent cases of Collins v. Walker, 329 F.2d 100; 335 F.2d 417 (CA 5—1964), cert. den., 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed.2d 175 and Brooks v. Beto, 366 F.2d 1 (CA 5—1966), nevertheless, it is incumbent upon this Court, whether it has definitive and reliable guidelines or not, to resolve the question raised by petitioner of whether or not his constitutional rights have been violated by the manner in which grand and petit juries have been selected in Tangipahoa Parish, Louisiana, according to its own understanding and interpretation of the law.

The Court in *Collins* held that if jury commissioners made a conscious effort to place the names of Negroes on a jury venire list in order to have a jury panel that reflected the proportionate ratio of white persons to colored persons in the community, such a venire was constitutionally invalid because it took race into consideration when the venire list was made up. The Court stated in *Collins* that any conscious effort to place a person's name on a venire list not because he was a man but because he was a Negro was an invalid act rendering the entire venire list illegal. This case was decided on July 21, 1964. But then, on July 29, 1966, the same Court, sitting en banc in Brooks v. Beto, supra, decided that *Collins* did not properly state the law, and consequently did a complete about face and decided that it was indeed incumbent upon jury selectors to consciously consider race in making up a jury venire list in order that the list would, in fact, represent a true cross section of the community. As of now, at least, *Brooks* has not been reversed or altered, but a reading of the various "concurring" opinions rendered therein would seem to indicate that it is, at best, rather shaky "authority" whose life span may be limited. In any event, *Brooks* holds that the jury commissioners *must* take race into consideration when it makes up the general venire list from which the grand and petit juries are ultimately drawn. It holds that it is incumbent upon jury commissioners not only to acquaint themselves with the racial makeup of the community which they represent, but to further acquaint themselves with the individuals that make up the various racial elements in that community so that

they may be aware of the presence of persons of various racial groups who are qualified to serve as jurors. After having acquainted themselves with the whereabouts of qualified prospective jurors in their districts, under *Brooks* the jury selectors are then bound to see that names are selected and placed upon the general venire in such a way as to result in a venire which at all times represents a fair cross section of the community. And if it can be shown that a fair cross section of the community is consistently lacking, then, without more, it is established that the commissioners have failed in their duty. Rabinowitz v. United States, 366 F.2d 34 (CA 5—1966). But exactly what will constitute an acceptable "fair cross section of the community" is not quite clear. For the time being, at least, a fair cross section of the community does not require that the proportion of each race represented on the venire be exactly and precisely the same as the proportionate representation of those races in the community. As stated in Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965):

"Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.' "

Indeed, in *Brooks,* while the Court makes it mandatory that jury commissioners consciously take into account the race of prospective jurors in order to end up with a venire representing "a fair cross section of the community," it at the same time *forbids* race being considered by the jury selectors for the purpose of actually securing *proportional representation.* In this connection the Court said:

"The dual requirements making awareness of race inevitable must be met,

but this must never, simply never, be done as the means of discrimination. It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation." 366 F.2d at page 24.

■ And furthermore, while under *Brooks* it is incumbent upon the jury selectors to see that the various races present in the community are fairly represented on the jury venire, without making such awareness of race a device of discrimination, or a device to secure proportional representation, or a device to secure a predetermined fixed limitation, there is apparently no requirement that any particular race be represented on the particular grand or petit jury, drawn by lot from a properly constituted general venire, that ultimately indicts or convicts the defendant. For as stated in *Swain:*

"But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. * * * Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." 85 S.Ct. at page 829.

As long as the general venire, compiled by jury selectors who are cognizant of and familiar with the racial make up of their community, reflects a fair cross section of the community, and as long as that list is made up of persons qualified by law to serve as jurors, and as long as the grand jury and the petit jury are then drawn fairly, by lot, from such a venire, it is apparently immaterial what the proportion of racial representation might be on the finally empanelled juries.

Since the appellate courts have taken the position that "[S]tatistics speak louder than the jury commissioners," Brooks v. Beto, 366 F.2d 1 (CA 5—1966), at page 12, it would be helpful for us to look at the available statistics in the present case. The only statistical evidence furnished this Court—and I believe that it is still

the law that a civil case such as this must be decided in accordance with the preponderance of the evidence—was that pertaining to the years of school completed by adults over 25 years of age in the various parishes in the State of Louisiana as of the 1960 census. These figures show that the total population of Tangipahoa Parish is 28,858, of which 8,477, or 29 per cent are Negroes. But of this total population, there are only 17,079 who have had a sixth grade education or better. Of this number only 2,975, or 17 per cent, were Negroes. And out of a total population of 14,396 persons who have had an eighth grade education or better, only 2,127, or 14.7 per cent were Negroes. While no exact figures were presented to the Court as to the number of registered voters in the Parish, it was agreed between counsel that 15 per cent of the total registered voters in Tangipahoa Parish are Negroes. As a practical matter, since the advent of the Voting Rights Act of 1965, with its attendant federal registrars and federal examiners, the only qualifications of any significance that one must possess in order to register to vote in Louisiana are that he *says* he is over 21 years of age and that *he says* he can read, write, speak and understand the English language. There was certainly no evidence in this case that there were any Negroes in Tangipahoa Parish possessing these qualifications who were not, in fact, registered to vote. And the percentage of registered voters who are Negroes (15 per cent) seems to very well bear this out. Under Federal law, there is a rebuttable presumption that one with a sixth grade education possesses sufficient literacy to vote. 42 U.S.C.A. § 1971(c). Of the people in Tangipahoa Parish who have a sixth grade education or better, 17 per cent are Negroes. Undoubtedly the presumption of literacy as to some of those Negroes could be successfully refuted. Of those people in Tangipahoa Parish with an eighth grade education or better, 14.7 per cent are Negroes. It would seem safe to presume that all of this latter group can read and write. Thus, it would further seem safe to assume that the percentage

of Negroes among all of the people in Tangipahoa Parish possessing the ability to read, write, speak and understand the English language would fall somewhere between 14.7 per cent and 17 per cent. It would thus follow that the 15 per cent of the registered voters who are Negroes would come very close to representing the Negro population in Tangipahoe Parish who possess the latest announced qualifications to serve as jurors, i. e., that they be able to read, write, speak and understand the English language.

Unless there is a showing that the voter registration rolls do not, in fact, represent a fair cross section of the community, there is nothing to prevent the jury selectors from using those rolls as a source, or in fact as the source of names of prospective jurors. In this regard the Court in *Rabinowitz* said:

"Nothing contained in this opinion is intended to shackle the court clerk or jury commissioner to any one source of prospective jurors. * * * 'The test is not whether voter registration lists are used, exclusively or otherwise, as a source of qualified jurors. The test is whether or not the use of such lists [or other sources] results in an array which is a representative cross-section of the community or from which a cognizable group or class of qualified citizens is systematically excluded. * * *'" 366 F.2d at page 57.

Thus, since the evidence indicates quite clearly that the voter registration rolls in Tangipahoa Parish do reflect a fair cross section of the community, the jury selectors are justified in using that list as a prime source of names for prospective jurors, just so long as they comply with the requirements of *Brooks* and see that when that list is used, the general venire made up therefrom also reflects a fair cross section of the community. In this case that would seem to mean that the general venire must contain the names of approximately, but apparently, according to *Brooks,* not exactly, 85 per cent white people and 15 per cent Negroes. The so-called guide lines at this point become a bit confusing.

*Brooks* teaches that race *must* be considered in order to bring about a fair cross section of the community on the venire, but then admonishes that race must "never, simply never" be considered in order to secure proportional representation of white and colored persons on the list. It is difficult to imagine a fairer "cross section of the community" than one made up of the same proportion of the different races as is present in the community. But to do that on purpose would be fatal to the entire venire, according to *Brooks.* On the other hand, according to Swain v. State of Alabama, supra, any deviation from the proportions existing in the community is permissible only if it is not brought about purposely in order to discriminate. At any rate it is apparent that some deviation from the exact proportions of the races in the community is allowable. While there is no set rule as to the amount of deviation that is permissible, nevertheless, some guidelines may be found in recent cases. For example, in *Swain* it was stated:

> "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%."

And in *Rabinowitz*, Judge Bell was of the opinion that a 10 per cent disparity between the representation of Negroes on a jury panel, and their representation in the entire community would not invalidate the panel. And in Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), the Court said:

> "Petitioner's attack is upon the way the statutory method of grand-jury selection has been administered by the jury commissioners. One charge is that discrimination must have been practiced because the Negro proportion of grand jurors is less than the Negro proportion of the county's population. Under the 1940 census the total population of Dallas County was 398,564, of whom 61,605 were Negroes. This is about 15.5%. In weighing this matter of custom, we limit ourselves, as do the parties, to the period between June 1,

1942, when Hill v. [State of] Texas, supra [316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559], was decided, and November 1947, when petitioner was indicted. There were 21 grand juries in this period; of the 252 members of the panels, 17, or 6.7% were Negroes. But this apparent discrepancy may be explained by the fact that Texas grand jurors must possess certain statutory qualifications. Grand jurors must ordinarily be eligible to vote; eligibility requires payment of a poll tax; and the validity of the poll-tax requirement is not challenged. * * * These figures would indicate that as a proportional matter 6.5% of grand jurors would be Negroes, a percentage approximating the ratio of Negroes actually sitting on the 21 grand jury panels. Without more it cannot be said that Negroes had been left off grand-jury panels to such a degree as to establish a *prima facie* case of discrimination."

And in Brooks v. Beto, supra, at page 19, the Court approved the holding in *Cassell* by saying:

> "The Court first took up the charge that the statistics, showing the Negroes, comprising 15.5% of the population, but only perhaps 6.5% of poll tax holders and thus qualified grand jurors, constituted only 6.7% of those on grand jury panels, established a prima facie case. The Court rejected this. 'Without more it cannot be said that * * * a prima facie case of discrimination' has been made out. * * * *"

With these principles in mind, we must now look to the testimony in this case to decide whether or not the plaintiff has carried the burden of proving his contention by direct evidence that there was a systematic exclusion of Negroes from the very grand jury which indicted him or the very petit jury which tried him, Brooks v. Beto, 366 F.2d 1 (CA 5—1966), at page 19, and whether or not he has proved, by a preponderance of all of the evidence, that there has been, in Tangipahoa Parish, Louisiana, long continued and unexplained gross varia-

tions in proportions of Negroes and whites on jury lists from the racial proportions in the population. Labat v. Bennett, 365 F.2d 698 (CA 5—1966); Billingsley v. Clayton, 359 F.2d 13 (CA 5—1966); Scott v. Walker, 358 F.2d 561 (CA 5—1966); and Rabinowitz v. United States, 366 F.2d 34 (CA 5—1966). In order to show that there was a purposeful exclusion of Negroes on either the grand jury which indicted petitioner, or the petit jury which tried him, it would be incumbent upon petitioner to show by direct evidence that such a deliberate exclusion took place. There is simply no evidence of any kind in this record to indicate that any such deliberate exclusion was practiced in connection with the petit jury or grand jury involved in petitioner's case. On the contrary, the evidence in the case shows that the indicting grand jury did, in fact, have one Negro on it. This amounts to 8.3 per cent representation as compared with 15 per cent Negro voters in the Parish, and 14.7 per cent Negroes who have had an elementary school education or better. But petitioner contends that there were only four Negroes' names on the list of 150 general venire jurors who were actually called in this case, and that there were only two Negroes' names on the additional list of 50 tales jurors who were called, making a total of only 3 per cent representation of Negroes on this list. But petitioner did not produce any evidence to show how many Negroes' names were included in the other 150 members of the general venire list. The complete venire list, which, under *Brooks* and related cases must show a fair cross section of the community, is composed of 300 names. Nor did petitioner offer any evidence of any kind relating to any other general venire list of the past. As opposed to this evidence, or this lack of evidence, Mr. Joe Chambers, a jury commissioner from Tangipahoa Parish, Louisiana, testified that out of 24 or 26 names regularly furnished by him as prospective jurors, he regularly included 3 or 4 Negroes' names. This would amount to 12.5 per

cent to 16.6 per cent Negro representation. Commissioner Paul Kornegay testified that he had, on this particular jury, submitted 3 out of 22 names, or 13.6 per cent Negro representation. The only other jury commissioner who was called to testify was Edith Lyles. While she could not recall the exact number of Negroes' names that she had submitted, she did testify that she almost always submitted at least the name of one Negro, and oftentimes more. So, even if it were two names of Negroes which she submitted out of the total list of 25 submitted by her, it would still amount to 8 per cent Negro representation.

These are the only commissioners from whom testimony was elicited by petitioner at the hearing of this case. And each of these commissioners testified unequivocally that they were in fact well acquainted with the Negro population of their community, and that they did take race into consideration when submitting the names of jurors from their districts to be placed on the general venire list. They further testified that in selecting and submitting names from among both the white and colored population of their areas, they relied heavily on the voter registration list as well as on their personal acquaintance with the people in their area, and that they attempted to select and submit names of persons whom they believed met the qualifications required under both State and Federal law for jury service. There was no evidence of any kind introduced to rebut this testimony. So, it is obvious that the plaintiff has not made out a case of discrimination by any direct testimony adduced at the trial of this case in the State Court nor in the hearing on his habeas corpus petition in this Court. And in the absence of having made out a case of discrimination by direct evidence, it would be incumbent upon petitioner to make out a prima facie case by showing long-continued and unexplained exclusion of a fair representation of qualified Negroes from jury lists. This also petitioner has failed to do. As the Court stated in

Scott v. Walker, 358 F.2d 561 (CA 5—1966):

"Finally, it is also clear that there is a burden of proof upon the petitioner in a habeas corpus proceeding to establish sufficient facts to warrant a finding of denial of his constitutional rights."

And in Billingsley v. Clayton, 359 F. 2d 13 (CA 5—1966):

"Bias and prejudice are not easily inferred and tend to be expelled by proof of fair representation of members of the complaining class or group on the juries involved. * * * Minimal representation of the group claimed to have been excluded from a particular jury roll in comparison with their proportion of the population is a proper element of proof, but such proof standing alone does not constitute sufficient evidence of constitutional violation if it is adequately explained and *is not long continued.*" (Emphasis added.)

And again, in *Billingsley,* the Court said:

"It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a particular jury is not enough; there must be a clear showing that its absence was caused by discrimination, and in nearly all cases it has been shown to have persisted over many years. * * * (Citing many cases.) * * * Also, when discrimination of an unconstitutional kind is alleged, the burden of proving it purposeful and intentional is on the defendant." 359 F.2d at page 17.

Thus, we have the petitioner saddled with the burden of proving either by direct testimony that the commissioners have failed in their duty to properly select names to be placed on the general venire list, or, in the alternative, to prove by a preponderance of the evidence that there has been a long-continued and unexplained discrimination against Negroes on jury panels in Tangipahoa Parish. He has failed in both instances. Both the testimony of the jury commissioners and the statistics preponderate against petitioner's contentions. The voter rolls of the Parish adequately reflect an acceptable proportion of whites and Negroes possessing juror qualifications, and all of the evidence presented by petitioner to this Court and to the State Trial Court reflects that Negroes were not purposely or systematically excluded from the jury venire in Tangipahoa Parish. As far as the evidence goes, it appears that somewhere between 8 per cent and 16.6 per cent of the names submitted to be included in the general venire list were the names of prospective Negro jurors. Petitioner has failed to prove that there was a substantial deviation on the jury panel from the 15 per cent Negro population in the community possessing juror qualification, and petitioner has further failed to present any evidence to prove any long-continued or unexplained deviation from a fair cross section of the community being represented on the jury venire list. Statistics not only speak louder than jury commissioners—they also speak louder than convicted petitioners looking for a way out.

This case is vastly different from Scott v. Walker, supra. In that case the Court of Appeals concluded that the evidence showed that no Negro had ever served on a criminal petit jury in Livingston Parish; that there were no Negroes' names included in the venire of 30 or the tales list of 50; that there was only one Negro name on the general venire of 300; and that there were *never* more than two Negroes' names at any time on any general venire list. This, despite the fact that 13 per cent of the population over the age of 21 years was Negro.

In short, in Scott v. Walker, the Court concluded that not more than one per cent of the usual jury venire list was Negro, and that this disparity between one per cent on the venire list and 13 per cent Negro population created a strong presumption of systematic exclusion which the State had failed to rebut. Such is not the case here. There is no evidence in this case to show any continued or long-standing exclusion of Negroes from the jury panel, and the

positive testimony introduced, together with the statistics filed in evidence, clearly shows that the jury commissioners have, in fact, performed their duty, as far as is possible, in accordance with the mandates of *Swain, Brooks,* and *Rabinowitz.*

Thus, it is the opinion of this Court that the evidence in this case has failed to disclose a systematic exclusion of Negroes from either the grand jury or the petit jury venire lists in Tangipahoa Parish, Louisiana, or that there was any deliberate exclusion of Negroes from either the grand jury which indicted petitioner or the petit jury by which he was tried and convicted. Thus, for these reasons, petitioner's application for the issuance of a writ of habeas corpus must be denied.