The **UNITED STATES**

v.

John P. **TILLMAN**, Robert Barber Moore, Johnny C. Wilson, Larry Fox, Donald P. Stone, Michael W. Simmons, and Simuel Brant Schutz.

Crim. No. 25009.

United States District Court
N. D. Georgia.
Aug. 4, 1967.

Howard Moore, Jr., Atlanta, Ga., for defendants.

SIDNEY O. SMITH, Jr., District Judge.

This is an indictment in which the defendants are charged with one count of violation of the Universal Military Training and Service Act (50 App. U.S.C.A. § 462) and one count of injuring government property (18 U.S.C.A. § 1361).[1] Upon arraignment, leave was granted to file motions thereafter under Rule 12, and the defendants have now moved to quash the indictments and to challenge the array of jurors under the decision of Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966).

By agreement, after extensions, the motion was presented by written affidavit and brief and the matter is now before the court for determination.

Following *Rabinowitz*, which eliminated the traditional "key man" system of selecting federal jurors, each district concerned reexamined its own system of jury selection with a view toward compliance with that decision.[2] In the summer and fall of 1966, the Northern District of Georgia revised its procedures in the Atlanta Division under order of the presiding judges. The system, the details of which will appear hereinafter, relies upon voter registration lists as the sole source of prospective jurors. This motion attacks the present jury lists obtained from such source as not complying with *Rabinowitz*, on the grounds:

(a) That voter registration lists are grossly inadequate to secure a representative cross-section of the community

Charles L. Goodson, U. S. Atty., Charles B. Lewis, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff.

1. An identical motion was filed in United States v. Steverson, Criminal 24,993. By agreement of the parties, this ruling will apply in the following pending cases as well: United States v. Sellers, Criminal 25,192; United States v. Battiste, Criminal 25,187; United States v. Kemp, Criminal 25,184; United States v. Simmons, Criminal 25,170.

2. The situation regarding proper sources for the selection of state juries is not yet clear and apparently states may still impose greater standards than the federal government or use the "key man" system, so long as it produces an adequate cross-section. Brown v. Allen, 344 U.S. 443(7), 73 S.Ct. 397, 97 L.Ed. 469 (1952); Whitus v. State of Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); United States ex rel. Sturdivant v. State of New Jersey, 289 F.2d 846 (3 Cir. 1961); Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966); Collins v. Walker, 329 F.2d 100 (5th Cir. 1964).

in that a significant number of qualified Negroes are not thereby considered for jury service.

(b) That the use of voter registration lists result in the imposition of standards in excess of those specified by 28 U.S.C.A. § 1861 and the Voting Rights Act of 1965.

(c) That, on information and belief, the use of voter registration lists results in the exclusion of a significant number of women and wage earners from consideration.

The last point was apparently an attempt to plead into Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966). However, this attack was abandoned and no evidence or argument was subsequently presented to the court on the lack of "women" or "wage earner" representation.

■ (a) At the outset it must be realized that there is not present here any claim of actual absence or exclusion of any group from the indicting grand jury or the prospective trial jury. That actual representation of any segment of the community on any particular jury is unnecessary has been put to rest by Swain v. State of Alabama, 380 U.S. 202, 203, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and Scott v. Walker, 358 F.2d 561 (5th Cir. 1966). What is involved is the basic legal question of voter registration lists as a proper *source*. Counsel have chosen to contest the case only on the traditional basis of whether Negro members of the community are under-represented in the resulting jury wheel. More to the point is whether Negro members of the community, as well as all other groups, are given an adequate cross-section on jury lists obtained from such source. All of the defendants are negro so there is no problem here of standing to make such an attack.[3]

■ In brief, of course, *Rabinowitz* stands for the proposition that in the need for a fair cross-section of the community and for competency, the jury commission may not ordinarily impose standards in excess of those prescribed by statute. And, "[t]he test is whether or not the use of such [voter registration] lists, [or other sources] results in an array which is a representative cross-section of the community or from which a cognizable group or class of qualified citizens is systematically excluded". Rabinowitz v. United States, 366 F.2d 34 at 57(18), quoting United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y. 1961). Thus there is an apparent affirmative duty to obtain an adequate cross-section and a negative duty not to exclude any group on a systematic basis.

Following the guideposts of this decision and influenced also by the jury provisions of the proposed "Civil Rights Act of 1966" (H.R. 14765, which passed the House, but failed in the Senate), this district instituted the new plan.

In brief,[4] the court provided for the selection of every 50th name (or 2%)

3. It is still not clear what persons may raise the question of juror qualifications as to race, economic classification, occupation, etc. The question was not raised or reached in *Rabinowitz*. The inference is that all defendants are entitled to an adequate cross-section of the community, but whether a white person may object specifically to negro exclusion, or a millionaire to wageearner exclusion, or a Catholic to Jewish exclusion, or any member of a group that is represented to absence of an unrepresented group is not definitely settled. See for example in this regard Smith v. State of Maryland, 362 F.2d 763 (4th Cir. 1966).

4. The details of the plan and procedure may be determined from examination of the Exhibits as follows:
The court's order, as amended (EX 1–A)
The questionnaire and covering letter (EX 1–B)
The Clerk's report to the Court (EX 1)
The statistical results (EX 1–C).

on the voter registration lists of each county in the Atlanta Division to be mailed questionnaires. The jury questionnaires[5] were properly mailed, with

5. Because of the information obtained, it is repeated here in full:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
OFFICE OF THE CLERK
P. O. BOX 1657, ATLANTA, GEORGIA

Claude L. Goza
Clerk

O. Wesley Harding
Jury Commissioner

## QUESTIONNAIRE AS TO QUALIFICATIONS FOR JURY DUTY

1. NAME (Please Print) _____
   (First)        (Middle)        (Last)

2. ADDRESS _____
   (Street No. or Box No.)  (Street or RFD)  (City)  (Zip Code)

   _____
   (County)

3. AGE ____ DATE OF BIRTH _____ SEX ____ RACE _____

4. Are you a citizen of the United States? _____
   (Yes or No)

5. How long have you resided in this District? _____
   (Month or Years)

6. Have you ever been convicted in a State or Federal Court of record of a crime punishable by imprisonment for more than one year? _____
   (Yes or No)

   IF YES _____
   (Nature of Crime)

   _____
   (Name of Court and date of conviction)

7. Can you read, write, speak and understand the English language? _____
   (Yes or No)

8. Do you have any mental or physical infirmities which would prevent you from rendering efficient jury service? _____
   (Yes or No)

   IF YES _____
   (Description or explanation of such infirmity)

9. Are you a member in active service in the Armed Forces of the United States? _____ (Yes or No)

10. Are you a member of the Fire or Police Departments of any State, District, Territory, Possession or subdivision thereof? _____ (Yes or No)

11. Are you a public officer in the executive, legislative or judicial branch of the government of the United States, or any State, District, Territory or Possession or subdivision thereof who are actively engaged in the performance of official duties? _____ (Yes or No)

    IF YES _____
    (Government Agency and Title of Position)

12. What was the last grade you completed in school? _____

DATE _____ SIGNATURE _____

a return of 50–60 per cent. Only those persons were disqualified by the Clerk and Jury Commissioner[6] whose answers stated that they had not attained the age of 21 years; or had been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year; or they could not read, write, speak and understand the English language; or they had a mental or physical infirmity which would prevent them from rendering efficient jury service (except that all females over 70 and all males over 75 were disqualified). All of this in accordance with 28 U.S.C.A. § 1861. On this basis, approximately 90% of persons returning questionnaires were found qualified, and *all* persons not disqualified were placed in the jury wheel. The result was an available juror pool of ½ to 1 per cent of the total names on voter registration lists in accordance with the court's amended order. The entire old jury wheel was emptied and the new names placed therein by December 20, 1966. Thus, the indicting grand jury here and all trial juries in the Division are taken from the reconstituted jury wheel.[7] A similar revision is now in process in all other divisions in the District.

Under such a procedure there has been and could be no systematic exclusion of negroes or any cognizable group or class of qualified citizens represented on the voter lists. Thus, one of the qualifications of Rabinowitz is fairly met.

However, the defendants here insist that negroes are not fully represented by the results and that, therefore, there is no adequate cross-section of the entire community from such a system. According to the 1960 census, negroes comprised 20.48% of the population 21 years of age or over in the Atlanta Division and 15.77% of the qualified jurors in the revised wheel. Regardless of the statistical viewpoint, it is this variance on which the claim of inadequate cross-section is bottomed.

What is a "fair cross-section"? *Rabinowitz* apparently defines it as "drawn from every economic and social group of the community without regard to race, color, or politics and * * * possess as high a degree of intelligence, morality, integrity and common sense as can be found". "[T]he sources from which they are selected should include all economic and social groups of the community. * * * [and] should represent as high a degree of intelligence, morality, integrity, and common sense as possible." "The line of demarcation is clear—a person need only be able to read, write, speak, and understand English, he need not enjoy that degree of excellence found only among the more fortunate classes of our society. Any attempt to gain competent jurors that would result in a less representative cross-section than a selection drawn from the statutorily qualified pool would destroy the 'right' to serve on juries which Congress intended to confer, as well as destroy the broad based cross-section Congress has designated for federal juries." Rabinowitz v. United States, 366 F.2d 34 at 55 and notes 52 and 53 (5th Cir. 1966). "The aim and purpose of the law is to obtain juries which truly represent a cross-section of the community, but there is no constitutional requirement that such juries represent the proportional strength or exact percentage of various components of the population." "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." Billingsley v. Clayton, 359 F.2d 13 at 18 (5th Cir.

---

6. The Jury Commissioner in the Atlanta Division is T. M. Alexander, Sr., Esq. an outstanding negro civic, business, and cultural leader of Atlanta.

7. See Gov't. Exhibit "A".

1966). "The 'cross-section' contemplated is not an absolute. Frequently such complete representation would be impossible." * * * "But it does mean that prospective jurors shall be selected by court officials without the use of irrational or self-imposed standards." United States v. Henderson, 298 F.2d 522 at 525 (7th Cir. 1962). "At the most, the notion of a jury as a cross-section of the community is a conceptual one. A literal cross-section is neither required nor desired." "Nobody contends that to obtain a 'cross-section' it would be required that names be taken at random from the totality of the inhabitants of the area in order to comply." Chance v. United States, 322 F.2d 201 at 204 (5th Cir. 1963). In short cross-section "means a *fair sample*." United States v. Dennis, 183 F.2d 201 (2nd Cir. 1950), aff'd 341 U.S. 484 (1951); United States v. Flynn, 216 F.2d 354 (2nd Cir. 1954). See, in general, also Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1964); Cassel v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1949); Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 (3rd Cir. 1955).

■ Based on these definitions, it is concluded that the jury wheel selected at random from the voter registration lists here constitutes a "fair sample" and satisfies the affirmative duty to produce an adequate cross-section.

In fact, the results produced 15.77% qualified negro jurors against 20.48% negro population over 21 years old (and incidentally, approximately 48% women). The grand juries empaneled since that time and returning the indictments in question were divided 19 white and 4 negro on February 13, 1967, and 18 white and 5 negro on May 15, 1967. Thus, the racial distribution thus far has actually produced reasonably proportionate percentages.[8]

■ Statistics, of course, have been historically used as a means to prove systematic exclusion and an inadequate cross-section. However, they are only a means and not an end itself. Procedurally, statistical disparity may carry the burden of proof and establish a "prima facie" case. Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed.

---

8. Absent such results, the query may arise when the questionnaire procedure produces a substantial disparity. Suppose, for an abstract example, the system here had resulted in less than 5% negro qualified jurors in the new jury wheel. Certainly no "irrational or self-imposed standards" would have been used by the Jury Commissioner, but such a result could happen fortuitously. When there is no systematic exclusion and when the selection is made objectively and impartially, reason would dictate that all that is required has been done. However, when the conceptual standard of an adequate cross-section is superimposed on a concurrent practical racial problem, the situation becomes blurred. There is reason to conclude that racial balance has become an *absolute* jury standard and prior permissive qualifications or sources become absolute if racial imbalance indirectly results. This pragmatic approach is demonstrated by such cases as Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966);

Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966); Scott v. Walker, 358 F.2d 56 (5th Cir. 1966) and a host of cases exemplified by the listing in note 3 of Billingsley v. Clayton, 359 F.2d 13 at 17 (5th Cir. 1966). When a bona fide system objectively administered happens to produce an imbalanced racial result, its legality is still somewhat subject to question. Until that question is finally resolved by the courts or new legislation, it would appear reasonable that a Jury Commissioner and Clerk would be justified in securing sufficient questionnaires from known negro electors until a sufficient number of such cognizable racial group in the community is adequately reflected on the qualified lists. Certainly, to within the permissible variances indicated in Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1964) and Billingsley v. Clayton, 359 F. 2d 13 (5th Cir. 1966). Otherwise, all interim trials would be open to this attack.

1074 (1935); Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1938); Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613 (1947); Scott v. Walker, 358 F.2d 561 (5th Cir. 1966); Davis v. Davis, 361 F.2d 770 (5th Cir. 1966). Then it becomes the government's duty to rebut such evidence. Here, as seen, the affirmative evidence clearly shows no such exclusion and the figures, even if grossly disparate, must yield to the uncontroverted facts. Billingsley v. Clayton, 359 F.2d 13 (5th Cir. 1966); Anderson v. Johnson, 371 F.2d 84 (6th Cir. 1966). Further, the literal disproportion is not great and would fall within permissible limitations even in the absence of such evidence. See Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824 (1964); Lane v. McDevitt, 255 F.Supp. 413 (E.D.Pa.1966); United States ex rel. Wilson v. Walker, 263 F.Supp. 289 (E.D. La.1967).

(b) Implicit in the motion is the further attack that the voter registration list is per se an improper source for selection of federal jurors. As evidence for such ground are offered negro-white voter registration statistics as of the summer of 1966, which indicate that in certain counties in the Atlanta Division, negro citizens were not registered in as high a proportion as white citizens of voting age. (See Def. Ex. "A" and "B"). These figures were gathered prior to full implementation of the Voting Rights Act of 1965 (42 U.S.C.A. § 1973 ff.) and if current reports are accurate, the statistics now, a year later, would show considerable increase in negro voting registration.

Be that as it may, the pertinent legal question is whether any voter registration list is an improper source for prospective jurors. The cases thus far indicate otherwise. In at least two instances, a direct attack was made on the voter's list as a source and denied. In the oft-cited case of United States v. Greenberg, 200 F.Supp. 382 (S.D.N.Y. 1961), the claim that the general population was under-registered on the lists and, therefore, that no cross-section resulted was rejected. It was specifically held that the "Civil Rights Act of 1957 did not prohibit *exclusive* use of voter registration lists as source of names of prospective jurors." Further, "[a]ll that is required is to use methods reasonably designed to produce a jury representative of a cross-section of the community. The objective selection of names at random from registration lists as they are maintained in this community fully satisfies this requirement and commends itself to an impartial jury system."

In this circuit, the claim that the state voter lists were unlawful *per se* was also rejected. "The use of voter registration lists is unlawful only if such use is a subterfuge to exclude systematically and intentionally members of (cognizable) groups or classes, *inasmuch as those who fail to register are not a cognizable class.*" (Emphasis supplied). Chance v. United States, 322 F.2d 201 at 203. To the same effect, see Gorin v. United States, 313 F.2d 641 (1st Cir. 1963); United States v. Van Allen, 208 F.Supp. 331 (S.D.N.Y.1962). United States ex rel. Wilson v. Walker, 263 F.Supp. 289 (E.D.La.1967). By inference, such source was approved in United States v. Flynn, 216 F.2d 354 at 386 (2nd Cir. 1954); Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 at 427 (3rd Cir. 1954); and in *Rabinowitz* itself at n. 57. It was apparently recommended by Judge Hand as far back as 1950 in United States v. Dennis, 183 F.2d 201 (2nd Cir. 1950).

There is certainly no basis to conclude that the voter registration lists exclude "a particular economic, social, religious, racial, geographical, or political group." Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

Particularly is this presently so, since the Voting Rights Act of 1965 in those states in which it applies, specifically permits the registration of all persons, even those with less than the statutory requisites for jury service. Compare 28 U.S.C.A. § 1861 with 42 U.S.C.A. § 1973b.

 (c) Thus, under existing statute and case law, the Voter Registration List is the most broadly based single list which can and does produce a fair cross-section of the community.[9] The methods and procedures used in maintaining those records are always open to public scrutiny or investigation, thus assuring fairness. They are reasonably up-to-date. Any good citizen regardless of race, creed or economic status who would make a good juror may register to vote. Likewise, any cognizable group in a community interested in the jury problem, may thereby receive automatic inclusion.

Accordingly, for the reasons stated, the Atlanta jury wheel drawn at random from voter lists is held valid and the motions must be denied.[10]

It is so ordered.

9. See the discussion of defects in other proposed sources, i.e., city directories, census reports, and private lists from organizations, in United States v. Greenberg, 200 F.Supp. 382 at 390, 391 (S.D. N.Y.1961).

10. This conclusion is strengthened by the current efforts toward definitive legislation following *Rabinowitz*. In seeking fair sources, the Judicial Conference of the United States, March 30, 1967, concluded that "voter lists are the best source of prospective jurors." See Report of the Judicial Conference Committee on the Operation of the Jury System as approved pages 14–18. 35 U.S.L.W. 2592. It is the basis of the draft bill recommended by the Conference and introduced in the Senate as S. 989. 113 Cong.Rec. 1 (S.Doc.No. 23, daily ed. February 16, 1967).
It is also the basis of at least two other bills on jury selection. One, S. 386, was

suggested by the Congress. 113 Cong. Rec. 1 (S.Doc.No. 5, daily ed. January 17, 1967). The other was initiated by the President as part of the Civil Rights Act of 1967. 113 Cong.Rec.H. 1397 (H.Doc. No. 56). Thus, the best thought of all three branches of government points toward voter registration lists as representing "the best cross-section of the community; indeed, they are probably the most broadly based lists available."

A description of the Atlanta Division system was distributed to each District in the United States by the Administrative Office of the United States Courts on January 27, 1967, as a recommended solution to the problems raised by *Rabinowitz* and *Whitus*. Hopefully, such a system may finally put the question to rest and the courts may concentrate on the orderly disposition of litigation, secure in the knowledge that its juries are free from inoperative defects.